FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 14 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

AMELIA NEGRON,

                            Plaintiff,

          -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION (DOC);
DORA SCHRIRO, *Commissioner of DOC*; ALAN
VENGERSKY, *Assistant Commissioner of
Personnel*; EMMANUAL BAILEY, *Warden of the
Eric M. Taylor Center (EMTC)*; W. TAYLOR,
*Deputy Warden of Security*; S. MORALES,
*Assistant Deputy Warden for EMTC, Shield No.
1055*; MITCHELL CHRISTOPHER, *Area Captain
for EMTC, Shield No. 350*; FELICIA JIMENEZ,
*Area Captain for EMTC, Shield No. 1184*; K.
WILLIAMS, *Control Room Captain for EMTC,
Shield No. 1389*; KIESHA DAVIS, *Captain
assigned to EMTC, Shield No. 855*; C. REID,
*Correction Officer assigned to EMTC, Shield No.
15875*; S. MEDINA, *Correction Officer assigned to
EMTC, Shield No. 8672*; NORMAN SEABROOK,
*President for the Correction Officers Benevolent
Association*; TYSON JONES, *Firearms Instructor
and Correction Officer*; and MIKE CARNELLO,
*Firearms Instructor and Correction Officer*,

                        Defendants.

------------------------------------------------------------X

**REPORT AND RECOMMENDATION
10 CV 2757 (RRM) (LB)**

**BLOOM, United States Magistrate Judge:**

       Plaintiff, Amelia Negron, brings this *pro se* action pursuant to 42 U.S.C. § 1981, 42

U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"),

the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the National

Labor Relations Act, 29 U.S.C. § 151, *et seq.* ("NLRA").   Plaintiff alleges that defendants City

of New York, New York City Department of Correction ("DOC"), Commissioner Dora Schriro,

1

Assistant Commissioner Alan Vengersky, Warden Emmanual Bailey, Deputy Warden W. Taylor, Area Captain Mitchell Christopher, Area Captain Felicia Jimenez, Control Room Captain K. Williams, Captain Kiesha Davis, Correction Officer C. Reid, Correction Officer S. Medina, Correction Officer Tyson Jones, and Correction Officer Mike Carnello (collectively, the "City defendants") discriminated against her on the basis of her gender and disability, retaliated against her, and denied her procedural due process.  Plaintiff further alleges that defendant Norman Seabrook, president of the Correction Officers Benevolent Association, breached the union's duty of fair representation.  The City defendants move to dismiss plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and defendant Seabrook moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  The Honorable Roslynn R. Mauskopf referred defendants' motions to me for a Report and Recommendation in accordance with 28 U.S.C § 636(b).  For the following reasons, it is respectfully recommended that the City defendants' motion pursuant to Rule 12(b)(1) should be denied and that the City defendants' motion pursuant to Rule 12(b)(6) should be granted in part and denied in part.  It is further recommended that defendant Seabrook's motion for judgment on the pleadings should be granted.

## BACKGROUND

In April 2008, plaintiff injured her left hand and chest in an accident on the firing range while training at the correction officer academy.  (Docket entry 1, Compl. at ¶¶ 3-4.)  Plaintiff reported the accident to the Health Management Division ("HMD") of DOC, received treatment for her injuries, and returned to the academy.  (Id. at ¶¶ 4-5.)  Plaintiff alleges that her firearm instructor at the academy, defendant Jones, "repeatedly tried to sexually proposition [her] every time [they] were alone."  (Id. at ¶ 5.)   Defendant Jones told plaintiff "that he would like to be

with a nice lady like [her], and he constantly commented about how pretty he thought [she] was." (Id.) After plaintiff denied defendant Jones's advances, he refused to help plaintiff meet the firearm certification requirement. (Id. at ¶¶ 6-7.) Plaintiff reported Jones's conduct to her union delegate and as a result, defendant Carnello replaced defendant Jones as plaintiff's firearm instructor. (Id. at ¶ 8.) Defendant Carnello was verbally abusive to plaintiff and refused to help plaintiff when she had difficulty performing tasks due to her injured hand. (Id. at ¶¶ 8-9.)

After plaintiff successfully completed training at the academy, she was assigned to the Eric M. Taylor Center ("EMTC") on Rikers Island as a correction officer in June 2008. (Id. at ¶ 11.) Plaintiff alleges that on one occasion in August 2008, her supervisor, defendant Christopher, asked her the following personal questions: "Do you have a boyfriend?" and "What's your sign?" (Id.) Plaintiff did not entertain his questions, and following that incident, defendant Christopher "consistently glared at [her]." (Id.)

On December 4, 2008, defendant Williams ordered plaintiff to suit up in riot gear and perform an outdoor search of the perimeter surrounding the institution. (Id. at ¶ 12.) Plaintiff alleges that she was not allowed to put on a jacket before going outdoors and was consequently exposed to severe cold weather for over thirty minutes, aggravating her injured left hand. (Id.) Over the next few months, plaintiff alleges that defendants Christopher, Williams, and Davis "disparately picked on" her by moving her constantly from one post to another, paging her over the loud speaker, and speaking to her in a disrespectful manner. (Id. at ¶ 13.) Plaintiff also alleges that defendant Christopher always instructed her, and no one else, to suit up in riot gear when coming off the midnight shift, and on three occasions assigned her to work in areas where inmates were isolated for treatment of swine flu. (Id.) Plaintiff sought to have her work schedule changed to avoid being harassed by defendants Christopher, Williams, and Davis, but

her request was denied. (Id. at ¶ 18.) On July 29, 2009, plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") regarding "the discriminatory abuse [she] was constantly subjected to by the supervisors of EMTC." (Id. at ¶ 19.) The DHR informed plaintiff that "they surrendered [her] complaint to the New York City Department of Correction's EEO Director (Carmen Acosta), and to the United States Equal Opportunity Commission," and plaintiff states that she has "not yet received a response from either party." (Id.)

On March 9, 2010, plaintiff was assigned to meal relief in the Four Upper housing unit of EMTC. (Id. at ¶ 20.) When she completed her tasks, plaintiff went to talk with Officer Ormejuste, who was assigned to meal relief on the Two and Three Upper A housing unit. (Id. at ¶ 20.) Officer Ormejuste opened the door for her and told her that music artist Lil' Wayne was housed in the unit. (Id. at ¶¶ 20-21.) Plaintiff then walked over to the Two and Three Upper B housing unit to greet defendant Medina. (Id. at ¶ 22.) When defendant Medina informed plaintiff that she was not supposed to be there, plaintiff exited the Two and Three Upper housing units. (Id.) Later that evening, defendant Christopher summoned plaintiff to the security office and ordered her to write a report explaining why she was inside the Two and Three Upper A housing unit. (Id. at ¶ 25.) Defendants Taylor and Bailey threatened to suspend or transfer plaintiff for attempting to visit Lil' Wayne. (Id. at ¶¶ 28-29.) When plaintiff and Officer Ormejuste were working on their incident reports, defendant Seabrook, president of the Correction Officers Benevolent Association, arrived and allegedly attempted to coerce Officer Ormejuste to report that plaintiff had persuaded him to open the door of the housing unit. (Id. at ¶¶ 31-35.) Plaintiff alleges that defendant Seabrook informed them that if they amended their incident reports to state that plaintiff had persuaded Officer Ormejuste to unlock the unit so that she could see the celebrity inmate, they would not be transferred, suspended, or criminally

4

charged, but would only be placed "on the wheel." (Id. at ¶ 36.)  Plaintiff "submit[ted] this falsified statement" and verbally confessed to Warden Bailey. (Id. at ¶ 37.)  Afterwards, plaintiff submitted a report to Commissioner Schriro, the Commissioner for the New York City Department of Investigation and the Bronx County District Attorney's Office explaining that she was coerced into submitting a falsified report by defendant Seabrook. (Id. at ¶ 38.)  Plaintiff claims that many supervisors and officers became convinced that she had "perpetrated a criminal act" by attempting to visit Lil' Wayne and this "created an emotionally hostile environment which made [her] fear [for her] physical safety." (Id. at ¶ 40.)  Plaintiff requested that Warden Bailey transfer her out of Rikers Island and conduct an investigation regarding the false claims against her. (Id. at ¶ 41.)

On March 12, 2010, plaintiff reported to HMD due to pain and inflammation in her injured left hand. (Id. at ¶ 42.)  HMD ordered that plaintiff be placed on MMR III status entitling her to a steady schedule with no utilization of her left hand and no inmate supervision. (Id.)  On March 16, 2010, plaintiff returned to work and defendants refused to comply with the HMD order. (Id. at ¶ 43.)  Plaintiff continued to request that she be permitted to work in accordance with the HMD order, but received no response to her letters. (Id. at ¶¶ 43-44.)  On March 24, 2010, plaintiff returned to HMD and upon examination of her inflamed left hand, plaintiff was ordered to stay home for four days. (Id. at ¶ 45.)  Plaintiff later returned to HMD on several occasions and HMD restricted plaintiff from returning to work until further notice. (Id. at ¶ 46.)

By letter dated April 19, 2010, defendant Vengersky informed plaintiff that as a probationary employee, her employment with DOC was terminated. (Id. at ¶ 47.)  Plaintiff objected to her termination in letters to defendant Vengersky and defendant Seabrook, arguing that she was not a probationary employee and that she was terminated without due process. (Id.)

Plaintiff alleges that she did not receive any response from defendants Vengersky and Seabrook. (Id.)

On April 26, 2010, plaintiff submitted a new charge of discrimination to the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation, sex discrimination, and disability discrimination. (Docket entry 1-3.) The new charge states "I, Amelia Negron, am enclosing a copy of my unfiled lawsuit, imploring the US Equal Employment Opportunity Commission to immediately furnish me with a Right to Sue letter, so I can properly file my complaint with the United States District Court." (Id.) By letter dated May 7, 2010, the DHR informed plaintiff that it was contemplating dismissing her complaint against the Department of Correction because "[t]he Division has been advised that Complainant intends to pursue federal remedies in court." (Docket entry 1, p. 19.[1])

Plaintiff commenced this action on June 16, 2010. (Docket Entry 1.) On August 11, 2010, defendant Seabrook answered the complaint. (Docket entry 10.) The City defendants move to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Docket entry 19.) Defendant Seabrook moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket entry 23.) Plaintiff opposes defendants' motions and defendant Seabrook has replied. (Docket entries 17 and 21, Plaintiff's Reply ("Pl.'s Opp."); docket entry 22, Reply Affirmation ("Seabrook Reply").)

---

[1] The Court references the ECF page numbers listed on the top of each page.

## DISCUSSION

### I.    Standard of Review

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Iqbal, 129 S. Ct. at 1950. Nonetheless, "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)); see also Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) ("We liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions 'to raise the strongest arguments they suggest.'") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)) (other citations omitted).   In deciding a motion to dismiss, the Court may consider, in addition to the complaint, documents that plaintiff attached to the pleadings, documents referenced in the complaint, documents that plaintiff relied on in bringing the action which were in plaintiff's possession or of which plaintiff had knowledge, and matters of which judicial notice may be taken. Chambers, 282 F.3d at 152-153.[2]

---

[2] The City defendants attach Executive Order No. 16 to their motion to dismiss and provide plaintiff with Local Civil Rule 12.1 Notice. (Docket entries 19-2 and 19-4.) Defendant Seabrook attaches the Constitution and By-Laws of the Correction Officers Benevolent Association to his motion for judgment on the pleadings. (Docket entry 23.)  The instant motions are decided without considering the attached documents, and therefore, the Court need not convert the motions.

"In deciding a Rule 12(c) motion, [the Court] appl[ies] the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." Desiano v. Warner-Lambert & Co., 467 F.3d 85, 89 (2d Cir. 2006) (quoting Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999)).

## II.     Plaintiff's Claims Against the City Defendants

### A. Claims Against the New York City Department of Correction

As a preliminary matter, defendant New York City Department of Correction is not a proper party to this action.  As an agency of the City of New York, the Department of Correction is not a suable entity.  See N.Y.C. Charter Ch. 17 § 396 (providing that all claims against agencies are claims against the City of New York); Darcy v. City of New York, No. 06-CV-2246 (RJD), 2011 U.S. Dist. LEXIS 23092, at *24 (E.D.N.Y. Mar. 8, 2011) (dismissing plaintiff's ADA claim against the New York City Police Department because "[a]s an agency of the City of New York, the NYPD may not be sued separately.");[3]  Woodward v. Morgenthau, 740 F. Supp. 2d 433, 440 (S.D.N.Y. 2010) ("[T]he Court finds that the Department of Corrections, as an agency of the City, is not a suable entity and dismisses Woodward's claims against it.").  Plaintiff's claims are properly made against the City of New York, not the Department of Correction.  Accordingly, plaintiff's claims against the New York City Department of Correction should be dismissed.

### B. Claims Pursuant to Title VII and the ADA

#### 1. Individual Liability

There is no individual liability under either Title VII or the ADA.  Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) ("[I]ndividuals are not subject to liability under Title

---

[3] The Clerk of Court is directed to send plaintiff the attached copies of all unreported cases cited herein.

VII.") (citation omitted); Fox v. State Univ. of N.Y., 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007)

("[T]here is no individual liability under Title I or Title II of the ADA.") (citations omitted).

Accordingly, to the extent that plaintiff seeks to hold any of the individual City defendants liable

under either Title VII or the ADA, plaintiff's claims should be dismissed.

### 2. Exhaustion of Administrative Remedies

Under Title VII and the ADA, a plaintiff must file a timely charge with the EEOC or an

equivalent state or city agency and receive a "right to sue" letter from the EEOC before filing an

action in federal court. See 42 U.S.C. § 2000e-5(f)(1) ([T]he Commission . . . shall so notify the

person aggrieved and within ninety days after the giving of such notice a civil action may be

brought . . . by the person claiming to be aggrieved."); 42 U.S.C. § 12117(a) (incorporating the

exhaustion procedures set forth in 42 U.S.C. § 2000e-5 into the ADA); McPherson v. N.Y. City

Dept. of Educ., 457 F.3d 211, 213 (2d Cir. 2006) ("A private plaintiff under Title VII must

satisfy two conditions before commencing suit in federal court."). "This exhaustion requirement

is an essential element of Title VII's statutory scheme, and is designed to give the administrative

agency the opportunity to investigate, mediate, and take remedial action." Shah v. N.Y. State

Dept. of Civil Serv., 168 F.3d 610, 614 (2d Cir. 1999) (internal quotation marks and citations

omitted). "[D]efendants are entitled to insist that plaintiffs comply" with the exhaustion of

administrative remedies through the EEOC. Francis v. City of New York, 235 F.3d 763, 768 (2d

Cir. 2000).

The City defendants argue that the Court lacks subject matter jurisdiction over plaintiff's

claims under Title VII and the ADA because she failed to obtain a "right to sue" letter from the

EEOC. (Docket entry 19-6, Municipal Defs.' Mem. of Law in Supp. of Mot. to Dismiss the

Compl. ("City Defs.' Mem."), pp. 13-14.) However, exhaustion of administrative remedies is

not a jurisdictional requirement, but rather a condition precedent to bringing a Title VII or ADA claim in federal court. <u>Francis</u>, 235 F.3d at 768 ("We hold that presentation of a Title VII claim to the EEOC is not a jurisdictional [prerequisite], but only a precondition to bringing a Title VII action that can be waived by the parties or the court.") (internal quotation marks and citation omitted); <u>Jonas v. Solow Mgmt. Co.</u>, No. 99 Civ. 8583 (RMB)(KNF), 2005 U.S. Dist. LEXIS 798, at *7-8 (S.D.N.Y. Jan. 3, 2005) ("As a precondition to filing an ADA claim in federal court, a plaintiff must first file timely a complaint with the EEOC.  However, this requirement is not jurisdictional.") (citations omitted).  Failure to exhaust is properly raised as a failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure,  not as a lack of subject matter jurisdiction under Rule 12(b)(1).  Accordingly, the City defendants' motion to dismiss pursuant to Rule 12(b)(1) should be denied.

Plaintiff alleges that she filed a charge of discrimination with the DHR on July 29, 2009, and the DHR forwarded the charge to the EEOC.  (Compl., ¶ 19.)  Plaintiff does not allege that she obtained a "right to sue" letter from the EEOC nor does she attach a "right to sue" letter to her complaint.  Indeed, plaintiff states that she did not receive a response regarding her charge of discrimination and that "as of this moment I am still waiting for that agency to furnish me [a "right to sue" letter.]  (<u>Id.</u>; Pl.'s Opp., p. 3.)

A plaintiff's failure to obtain a "right to sue" letter can be waived by the parties or the Court.  <u>See</u> <u>Pietras v. Bd. of Fire Comm'rs</u>, 180 F.3d 468, 474 (2d Cir. 1999).  By bringing the instant motion and arguing that plaintiff's claims under Title VII and the ADA should be dismissed for her failure to obtain a "right to sue" letter, defendants have not waived the issue. <u>See</u> <u>Bey v. Welsbach Elec. Corp.</u>, No. 01 CV 2667 (LAP), 2001 U.S. Dist. LEXIS 10811, at *8 (S.D.N.Y. July 30, 2001) (finding that defendant did not waive plaintiff's failure to obtain a

"right to sue" letter because the issue was raised in defendant's motion to dismiss).   For the Court to waive a plaintiff's failure to obtain a "right to sue" letter, "the plaintiff must show or allege that he made an effort to procure the right to sue letter or that he raised the failure to issue a right to sue letter with the EEOC." Canty v. Wackenhut Corr. Corp., 255 F. Supp. 2d 113, 117 (E.D.N.Y. 2003); see also Pietras, 180 F.3d at 474 (finding that the district court did not abuse its discretion by excusing plaintiff's failure to obtain a "right to sue" letter where plaintiff made a "diligent effort" to obtain the letter from the EEOC).

On April 26, 2010, one week after her employment was terminated, plaintiff filed a new charge of discrimination with the EEOC which specifically requested that the EEOC "immediately furnish [her] with a Right to Sue letter, so [she could] properly file [her] complaint with the United States District Court." (Docket entry 1-3.) Plaintiff also requested that the DHR dismiss her charge of discrimination so that she could "pursue federal remedies in court." (Docket entry 1, p. 19.) By letter dated May 7, 2010, the DHR notified the parties herein that it was contemplating dismissing plaintiff's case against the Department of Correction for administrative convenience.   (Id.)   Objections to the DHR's proposed administrative convenience dismissal were to be submitted within fifteen days of the May 7, 2010 letter.  (Id.) Less than two months after requesting a "right to sue" letter from the EEOC, but without having received it, plaintiff filed the instant action.  In light of plaintiff's attempts to obtain a "right to sue" letter from the EEOC with respect to the charge of discrimination initially filed with the DHR, her failure to obtain the letter should not preclude her from raising her Title VII and the ADA claims in this Court.[4]  See  Gonzalez v. City of New York, 354 F. Supp. 2d 327, 332 n.12

---

[4] The Court notes that plaintiff's claims under the ADA may be unexhausted as they may not be reasonably related to plaintiff's July 29, 2009 charge of a hostile work environment filed with the DHR. See Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006) (citation omitted) ("Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency."); Holmes v.

(S.D.N.Y. 2005) ("In light of plaintiffs' allegation that Rivera twice attempted to obtain a right-to-sue letter, the Court finds that his failure to produce one does not bar him from filing this lawsuit.").

### 3. Gender Discrimination Under Title VII

Plaintiff alleges that various supervisors and correction officers at EMTC subjected her to a hostile work environment and quid pro quo sexual harassment in violation of Title VII. To state a claim for a hostile work environment, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive - that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and citation omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "Even when a plaintiff establishes that she was exposed to an objectively and subjectively hostile work environment, 'she will not have a claim . . . unless she can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class.'" Bermudez v. City of New York, No. 10 Civ. 1162 (CM), 2011 U.S. Dist. LEXIS 33807, at *32 (quoting Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 704 (S.D.N.Y.

---

Long Island R.R., No. 96 CV 6196 (NG), 1998 U.S. Dist. LEXIS 21630, at *6 (E.D.N.Y. Dec. 19, 1998) (dismissing plaintiff's ADA claim because it was "not reasonably related to the sexual harassment claim alleged in the EEOC charge."). However, as the City defendants' motion does not raise this argument and the July 29, 2009 charge is not part of the instant record, the Court should not reach the issue.

2003)).  "An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes." Forts v. City of N.Y. Dep't of Corr., No. 00 Civ. 1716 (LTS)(FM), 2003 U.S. Dist. LEXIS 9347, at *13 (S.D.N.Y. June 4, 2003) (citations omitted).

Although plaintiff alleges numerous instances of hostile conduct committed by various individuals, she alleges only a few instances of hostile conduct that could plausibly be motivated by her gender.  Specifically, plaintiff alleges that her firearms instructor, defendant Jones, "repeatedly tried to sexually proposition [her] every time [they] were alone" at the training academy in April 2008. (Compl., ¶ 5.) Plaintiff alleges that defendant Jones told plaintiff "that he would like to be with a nice lady like [her], and he constantly commented about how pretty he thought [she] was." (Id.) After plaintiff denied his advances, defendant Jones refused to help plaintiff to meet the firearm certification requirement. (Id. at ¶¶ 6-7.) Plaintiff reported Jones's conduct to her union delegate and as a result, defendant Jones was removed as plaintiff's firearm instructor. (Id. at ¶ 8.)

Plaintiff further alleges that while she was working at EMTC in August 2008, her supervisor, defendant Christopher asked her the following personal questions: "Do you have a boyfriend?" and "What's your sign?" (Id. at ¶ 11.) Plaintiff did not entertain Christopher's questions, and as a result, he "consistently glared at [her]." (Id.) Moreover, plaintiff alleges that between December 2008 and June 2009 defendant Christopher, along with two other supervisors, "disparately picked on" her by moving her constantly from one post to another, paging her over the loud speaker, and speaking to her in a disrespectful manner. (Id. at ¶ 13.) Plaintiff also alleges that defendant Christopher always instructed her, and no one else, to suit up in riot gear

while coming off the midnight shift, and on three occasions he assigned her to work in areas where inmates were isolated for treatment of swine flu. (Id.)

Plaintiff's allegations regarding the conduct of defendants Jones and Christopher fail to state a claim for hostile work environment under Title VII. Plaintiff alleges that defendant Jones's comments started in May 2008, that defendant Jones was removed as plaintiff's firearm instructor when she complained, and that by mid-June plaintiff had completed training at the academy and had been assigned to EMTC. (Id. at ¶¶ 5-11.) Although the Court does not condone defendant Jones's alleged conduct, it was not objectively severe or pervasive and at most lasted for several weeks. As for defendant Christopher's conduct, plaintiff alleges that on one occasion in August 2008 defendant Christopher made gender-based comments to her. Apart from those comments, plaintiff alleges that defendant Christopher gave her unfavorable work assignments, paged her over the loud speaker, and spoke to her in a disrespectful manner. Although defendant Christopher's question whether plaintiff had a boyfriend may have been inappropriate, plaintiff does not allege sufficient facts to show that defendant Christopher's alleged harassment of plaintiff from December 2008 to June 2009 was gender-based. As plaintiff only alleges that defendant Jones made gender-based comments to her over a period of several weeks in May 2008 and that defendant Christopher asked her an inappropriate question on one occasion in August 2008, plaintiff does not allege facts that would tend to show that the complained of conduct was objectively severe or pervasive.

Although plaintiff perceived other supervisors and correction officers to be hostile to her, plaintiff does not allege any facts connecting their conduct to prohibited discrimination. Plaintiff alleges that after she complained about defendant Jones's behavior, defendant Carnello was assigned to replace defendant Jones as her firearm instructor. (Id. at ¶ 8.) Defendant Carnello

14

allegedly was verbally abusive to plaintiff and refused to help her when she had difficulty performing tasks due to her injured hand. (Id. at ¶¶ 8-9.) Plaintiff further alleges that between December 2008 and June 2009, defendants Williams and Davis, together with defendant Christopher, "disparately picked on" her by moving her constantly from one post to another, paging her over the loud speaker, and speaking to her in a disrespectful manner. (Id. at ¶ 13.) In addition to such conduct, plaintiff alleges that defendant Williams ordered plaintiff to suit up in riot gear and perform an outdoor search of the institution's perimeter on December 4, 2008 and that defendants Williams and Davis assigned her many meal reliefs and "other random tasks." (Id. at ¶¶ 12, 18.) Finally, plaintiff alleges that defendants Taylor, Morales, Jimenez, and Reid "slandered" her name by stating that she attempted to visit Lil' Wayne, which created an "emotionally hostile environment," and that defendant Medina would not let her enter the Two and Three Upper housing unit. (Id. at ¶¶ 22, 27, 39, 40, 41.) Plaintiff's allegations of hostile conduct by defendants Carnello, Davis, Williams, Taylor, Morales, Jimenez, Reid and Medina cannot withstand defendants' motion for failure to state a claim for a hostile work environment under Title VII because plaintiff does not allege sufficient facts to plausibly suggest that defendants' conduct was motivated by her gender.[5]

Quid pro quo harassment occurs when "a tangible employment action result[s] from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998). "To state a quid pro quo claim, [a plaintiff] must show a 'tangible employment action,' i.e., that an 'explicit . . . alteration[] in the terms or conditions of employment' resulted from her refusal to submit to [a supervisor's] sexual advances." Schiano v. Quality Payroll Sys., 445 F.3d 597, 604 (2d Cir. 2006) (quoting Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004)). "A tangible employment action usually constitutes a

---

[5] Plaintiff does not allege that defendants Schriro, Vengersky, or Bailey subjected her to a hostile work environment.

significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. (internal quotation marks and citations omitted). If a "claim involves only unfulfilled threats, it should be classified as a hostile work environment claim which requires a showing of severe or pervasive conduct." Ellerth, 524 U.S. at 754.

Plaintiff alleges that defendant Jones made suggestive comments to her on several occasions while plaintiff was at the correction officer academy and plaintiff told him that she was not interested in him. (Id. at ¶¶ 5-6.) In response, plaintiff alleges that defendant Jones "completely abandoned" her as an instructor and "ignored [her] when [she] called upon him for help while [she] was on the firing line." (Id. at ¶ 6.) Shortly thereafter, defendant Jones was removed as plaintiff's instructor. (Id. at ¶ 8.) Plaintiff's allegations of abandonment by her firearm instructor fail to demonstrate that a tangible employment action was taken against her for refusing Jones's sexual advances.

Plaintiff further alleges that she did not entertain defendant Christopher's inappropriate question that she perceived as a sexual advance when she was assigned to EMTC. (Id. at ¶ 11.) Plaintiff alleges that as a result, defendant Christopher gave her unfavorable work assignments at EMTC, such as requiring her to suit up in riot gear and work in the infectious areas of EMTC. (Id. at ¶¶ 12-13.) However, as these assignments by defendant Christopher were within plaintiff's duties as a correction officer and did not entail significantly different job responsibilities, plaintiff fails to allege facts sufficient to support a claim that defendant Christopher took a tangible employment action against her for refusing his sexual advances.

Accordingly, the City defendants' motion to dismiss should be granted on plaintiff's hostile work environment and quid pro quo sexual harassment claims under Title VII.[6]

### 4. Disability Discrimination Under the ADA

The ADA provides that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).[7]  Discrimination under the ADA includes "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

> Where [] a disabled plaintiff claims that he can perform a particular job with a
> reasonable accommodation, the prima facie burden requires a showing that (1)

---

[6] To the extent that plaintiff alleges that the officers and supervisors at EMTC retaliated against her for opposing or complaining about sexual harassment allegedly committed by defendant Jones or defendant Christopher, plaintiff's retaliation claim under the Title VII cannot withstand the City defendants' motion to dismiss.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).  A retaliatory hostile work environment may constitute an adverse employment action sufficient to give rise to Title VII liability.  See Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999); Salerno v. City Univ. of N.Y., No. 99 Civ. 11151 (NRB), 2003 U.S. Dist. LEXIS 16474, at *36 (S.D.N.Y. Sept. 18, 2003).  Even assuming that defendant Carnello's conduct was causally related to plaintiff's complaint against defendant Jones in May 2008, plaintiff fails to allege facts sufficient to show that defendant Carnello's verbal abuse and refusal to help her on the firing range were objectively severe or pervasive.  Moreover, to the extent that plaintiff claims that defendants Christopher, Davis, and Williams harassed her because she opposed defendant Christopher's sexual advance, plaintiff fails to allege facts sufficient to show that their conduct was objectively severe or pervasive.  Finally, plaintiff allegations regarding defendants Taylor, Morales, Jimenez, Reid, and Medina fail to support an inference that their hostile conduct was causally connected to plaintiff's opposition to the sexual harassment allegedly committed by defendant Jones or defendant Christopher.

[7] The ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 ("2008 Amendments"), became effective on January 1, 2009.  The 2008 Amendments expanded the ADA's definition of disability and the class of major life activities protected by the ADA.  Although the 2008 Amendments have not been applied retroactively by district courts in this Circuit, see White v. Sears, Roebuck & Co., No. 07-CV-4286, 2009 U.S. Dist. LEXIS 35554, at *16-17 (E.D.N.Y. Apr. 27, 2009) (citing cases), the instant action alleges conduct that occurred after the effective date of the 2008 Amendments.  Accordingly, the Court applies 2008 Amendments to plaintiff's claim.

plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) ("Terminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA."). "[A] plaintiff need not plead 'specific facts establishing a prima facie case of discrimination' in violation of the ADA to survive a motion to dismiss." Starr v. Time Warner, Inc., No. 07 Civ. 5871 (DC), 2007 U.S. Dist. LEXIS 88219, at *12 (S.D.N.Y. Nov. 21, 2007) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002)).

The City defendants argue that plaintiff's ADA claims should be dismissed because she has failed to plead that she is disabled within the meaning of the ADA. (City Defs.' Mem., p. 21.) The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The Court construes the definition of disability "in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). The ADA does not define the term "impairment," but EEOC regulations do, and this Circuit has consistently looked to EEOC regulations with "great deference" when determining whether a person is disabled under the ADA. Reeves v. Johnson Controls World Servs., 140 F.3d 144, 150 n.3 (2d Cir. 1998). The EEOC regulations define physical or mental impairment as:

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological,

> musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). Plaintiff alleges that bullet fragments are lodged in her left hand and chest as a result of a firearm accident in April 2008 and that this condition causes her pain and inflammation. (Compl. at ¶¶ 3-4, 12, 42, 45-46.) Liberally construed, plaintiff has sufficiently pled that she has a physiological condition or cosmetic disfigurement that affects her musculoskeletal system.

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Plaintiff does not detail how her impairment affects her life activities. Instead, plaintiff states that her impairment affected her ability to work at EMTC. Plaintiff alleges that upon examination of her hand on March 12, 2010, HMD recommended that she no longer utilize her left hand at work. (Compl., ¶ 42.) Upon further examination of her hand on March 24, 2010, HMD ordered plaintiff to not return to work. (Id. at ¶ 45.) Liberally construing the complaint, plaintiff's allegations suggest that her impairment affected two major life activities enumerated in the ADA – her ability to perform manual tasks and her ability to work.

The Second Circuit applies the definition of "substantially limits" set forth in the EEOC regulations to determine if an employee is disabled within the meaning of the ADA. See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998). Following the 2008 Amendments, the EEOC regulations define "substantially limits," in part, as follows:

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.
> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.
> (vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

29 C.F.R. § 1630.2(j)(1). Prior to the 2008 Amendments, the EEOC's regulations included the following "specialized definition of the term 'substantially limits' when referring to the major life activity of working: 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (quoting 29 C.F.R. § 1630(j)(3)(i)). However, the EEOC regulations promulgated after the 2008 Amendments do not include any such specialized definition. The EEOC's Interpretive Guidance on Title I of the ADA provides that:

> [i]n most instances, an individual with a disability will be able to establish coverage by showing substantial limitation of a major life activity other than

20

working . . . .  In the rare cases where an individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities. In keeping with the findings and purposes of the Amendments Act, the determination of coverage under the law should not require extensive and elaborate assessment, and the EEOC and the courts are to apply a lower standard in determining when an impairment substantially limits a major life activity, including the major life activity of working, than they applied prior to the Amendments Act.

29 C.F.R. § 1630 app.  The EEOC's Interpretive Guidance further clarifies that "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." Id.

Plaintiff alleges that she experienced pain and inflammation in her left hand on sporadic occasions during 2008 and 2009 while working at EMTC.  (Compl., ¶ 12.)  However, plaintiff alleges that she reported to HMD regarding her hand on multiple occasions in March 2010.  (Id. at ¶¶ 42-46.)  Specifically, plaintiff alleges that on March 12, 2010, HMD ordered her on MMR III status, which would restrict her from supervising inmates or utilizing her left hand.  (Id. at ¶ 42.)  Following an examination of her hand on March 24, 2010, HMD ordered plaintiff not to return to work and plaintiff remained on leave until her employment was terminated on April 19, 2010.  (Id. at ¶¶ 45-47.)

To determine whether plaintiff's impairment substantially limits her ability to perform manual tasks or other jobs, the Court considers the effect of plaintiff's seemingly episodic impairment when it was active, such as it was in March 2010.  At that time, plaintiff alleges that the pain and inflammation in her hand not only restricted her ability to utilize her left hand at work, but prevented her from working at all.  As plaintiff could not use her left hand to perform tasks at work, the Court finds that plaintiff has sufficiently alleged that her impairment substantially limits her ability to perform manual tasks compared to most people in the general

population.  Regarding the effect of plaintiff's impairment on her ability to work, plaintiff does not allege how her impairment affects her ability to perform other jobs.  However, given that plaintiff's impairment required medical leave for one month, plaintiff sufficiently alleges that her impairment substantially limits her ability to perform not just the unique tasks required of a correction officer, but rather a broader range of jobs in various classes as compared to most people having comparable training, skills, and abilities.

Aside from arguing that plaintiff is not disabled under the ADA, the City defendants' instant motion to dismiss does not address plaintiff's reasonable accommodation claim.  Plaintiff alleges that she was denied a reasonable accommodation when she was not placed on MMR III status as recommended by HMD on March 12, 2010.  (Compl., ¶ 42.)  Plaintiff states that when she returned to duty on March 16, 2010, Officer Mack told her that she would not comply with HMD's recommendation.  (Id. at ¶ 43.)  Plaintiff then wrote to Warden Bailey and Deputy Warden Jackson about Officer Mack's failure to provide her with the accommodation, but did not receive any response.  (Id.)  Plaintiff alleges that she continued to work until March 24, 2010, when HMD ordered her not to return to work.  (Id. at ¶ 45.)  Plaintiff has alleged sufficient facts to state a reasonable accommodation claim based on defendants' refusal to place her on MMR III status.  Whether plaintiff would have been able to perform the essential functions of her job if she had been placed on MMR III status cannot be determined on the instant record.

Liberally construing the complaint, plaintiff also alleges that she was denied a reasonable accommodation when she was terminated and that she should have been given additional leave for her disability.  Plaintiff alleges that HMD ordered her not to return to work on March 24, 2010.  (Id. at ¶ 45.)  In the following weeks, plaintiff alleges that she returned to HMD on several occasions and they determined that the injuries to her left hand and chest were severe enough to

warrant continued leave. (Id. at ¶ 46.) After being on leave for about one month, plaintiff's employment was terminated on April 19, 2010. (Id. at ¶ 47.) As plaintiff was on leave at the time, it is clear that plaintiff was unable to perform the essential functions of her job on April 19, 2010 without an accommodation. The ADA does not require that an employer provide leave for an indefinite period of time as an accommodation for an employee's disability. See Parker, 204 F.3d at 338 ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work."); Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 9 (2d Cir. 1999) (holding that employer was not required to grant an indefinite leave of absence where there was no expectation that plaintiff would to able to return to work); see also Starr, 2007 U.S. Dist. LEXIS 88219, at *12 (dismissing reasonable accommodation claim because "[a]s a matter of law, a two-year leave is too long an absence from work to be reasonable"). However, a leave of absence for a finite period of time may constitute a reasonable accommodation under the ADA. Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 185 n.5 (2d Cir. 2006) (vacating the grant of summary judgment on plaintiff's reasonable accommodation claim where the district court misidentified plaintiff's leave request as indefinite).

In Graves, the Second Circuit noted that "the idea of unpaid leave of absence as a reasonable accommodation presents 'a troublesome problem, partly because of the oxymoronic anomaly it harbors' – the idea that allowing a disabled employee to leave a job allows him to perform that job's functions – 'but also because of the daunting challenge of line-drawing it presents.'" Id. (internal quotation marks and citation omitted).[8] Given the short amount of time

---

[8] In Graves, the Second Circuit did "not reach the question of how assured the employer must be of an employee's

that plaintiff was on leave before her termination and the episodic nature of her alleged disability, whether additional leave would have enabled plaintiff to perform the essential functions of her job and whether additional leave was reasonable cannot be determined on the instant record. See Verrocchio v. Fed. Express Corp., No. 3:09-cv-1376, 2010 U.S. Dist. LEXIS 13822, at *10 (N.D.N.Y. Feb. 17, 2010) (finding that plaintiff, who had been provided nine months of medical leave before his employment was terminated, stated a reasonable accommodation claim under the ADA because "[i]f additional medical leave would have enable[d] Plaintiff to perform the essential functions of the job, then it is arguable that he was a 'qualified individual with a disability.'"); Tully-Boone v. N. Shore Long Island Jewish Hosp. Sys., 588 F. Supp. 2d 419, 425 (E.D.N.Y. 2008) (finding that plaintiff's request for leave as an accommodation for her disability was not unreasonable as a matter of law at the motion to dismiss stage).

Accordingly, the City defendants' motion to dismiss should be denied as to plaintiff's reasonable accommodation claims under the ADA.

## C. Discrimination Claim Pursuant to 42 U.S.C. § 1981

To the extent that plaintiff claims that her employment was terminated in violation of 42 U.S.C. § 1981, plaintiff's claim cannot withstand the City defendants' instant motion to dismiss. Section 1981 provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The right to make and enforce contracts "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

---

successful return following a proposed finite leave of absence in order for the finite leave to be a reasonable accommodation." Id. at 186 n. 6.

24

relationship." 42 U.S.C. § 1981(b). "To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000) (citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993)).

Here, plaintiff makes no allegations of discrimination on the basis of her race. Rather, plaintiff alleges that defendants discriminated against her on the basis of her gender and disability – neither of which are protected classes under 42 U.S.C. § 1981. See Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998) ("It is also settled that Section 1981 does not prohibit discrimination on the basis of gender.") (citations omitted). Moreover, even if plaintiff were to allege racial discrimination, such a claim would fail because "plaintiff's Section 1981 claim for racial discrimination must be pursued through Section 1983, as Section 1983 provides the exclusive remedy for violation of the rights guaranteed under Section 1981 in a claim against a state actor." Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 708 (S.D.N.Y. 2003) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989)); see Bermudez, 2011 U.S. Dist. LEXIS 33807, at *26 (dismissing plaintiff's Section 1981 employment discrimination claim against state actors). Accordingly, the City defendants' motion to dismiss should be granted on plaintiff's discrimination claim pursuant to 42 U.S.C. § 1981.

### D. Claims Pursuant to 42 U.S.C. § 1983

#### 1. Equal Protection Claim for Gender Discrimination

"Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation

of . . . the Equal Protection Clause." Patterson, 375 F.3d at 225. "[I]ndividuals may be held liable under . . . [Section] 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." Id. However, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." Id. at 229 (citation omitted). "Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." Id. (citation omitted).

As discussed above, plaintiff fails to allege facts to support an inference that the conduct of defendants Carnello, Williams, Davis, Taylor, Morales, Jimenez, Reid or Medina was plausibly motivated by her gender. Therefore, plaintiff fails to state a claim under the Equal Protection Clause against any of these defendants because she does not allege their personal involvement in any unconstitutional act. Moreover, plaintiff's allegations that defendants Jones and Christopher harassed her based on her gender fail to rise to the level of a hostile work environment or quid pro quo sexual harassment claim under the Equal Protection Clause for the same reasons that plaintiff's allegations fail to state a claim under Title VII. Accordingly, the City defendants' motion to dismiss should be granted on plaintiff's Equal Protection claims of gender discrimination under 42 U.S.C. § 1983.[9]

---

[9] To the extent that plaintiff alleges that the officers and supervisors at EMTC retaliated against her for opposing or complaining about a hostile work environment, plaintiff's retaliation claim under the Equal Protection Clause cannot withstand the City defendants' motion to dismiss. See Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 199 (E.D.N.Y. 2009) ("[T]here is no recognized claim for retaliation under the Equal Protection Clause.").

## 2. Equal Protection Claim for Disability Discrimination

Plaintiff claims that defendants discriminated against her on the basis of her disability when her employment as a correction officer was terminated while she was on leave for her injured hand. Defendants argue that disability discrimination claims cannot be brought pursuant to 42 U.S.C. § 1983. (City Defs.' Mem., p. 24, n.4.) However, the only case cited by the City defendants, Chernoff v. City of New York, No. 06-CV-2897 (CPS)(CLP), 2009 U.S. Dist. LEXIS 24849, at *17, n.7 (E.D.N.Y. Mar. 26, 2009), does not support this broad proposition. The Court in Chernoff stated that the amended complaint "does not set forth the constitutional or statutory basis upon which plaintiff's § 1983 disability discrimination claim is predicated," and "assuming that plaintiff's §1983 disability discrimination claim alleges a violation of the Americans with Disabilities Act ("ADA"), it is doubtful that plaintiff could properly assert such a claim." Id. The Chernoff Court did not address the *constitutional* basis of a disability discrimination claim under 42 U.S.C. § 1983.

In fact, there is disagreement within the Second Circuit on whether a public employee may bring an Equal Protection claim for disability discrimination under 42 U.S.C. § 1983. Compare Gallagher v. Town of Fairfield, No. 3:10-cv-1270 (CFD), 2011 U.S. Dist. LEXIS 90459, at *12 (D. Conn. Aug. 15, 2011) (finding that plaintiff "does not have a cognizable claim under the Equal Protection Clause" because disability is not a protected class); Kaiser v. Highland Cent. Sch. Dist., No. 1:08-CV-0436, 2008 U.S. Dist. LEXIS 98936, at *4 (N.D.N.Y. Dec. 8, 2008) (finding that "a plaintiff asserting an Equal Protection claim under 42 U.S.C. § 1983 based on disability discrimination is asserting a 'class of one' Equal Protection claim," which is barred by the Supreme Court's decision in Enquist v. Or. Dep't of Agric., 553 U.S. 591, 606-607 (2008)), with Graham v. Watertown City Sch. Dist., No. 7:10-CV-756, 2011 U.S. Dist.

LEXIS 38398, at *14 (N.D.N.Y. Apr. 8, 2011) (finding that public employee alleging disability discrimination "states a class-based equal protection claim, not a class-of-one claim"). However, even if a disability discrimination claim by a public employee were cognizable under the Equal Protection Clause, plaintiff's claim could not withstand the City defendants' instant motion to dismiss.

First, to the extent that plaintiff alleges that defendants discriminated against her on the basis of her disability by not providing her with a workplace accommodation for her injured left hand, plaintiff's claim fails because the Equal Protection Clause does not require accommodations for the disabled. See Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 368 (2001) ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause."). Second, plaintiff only alleges the personal involvement of defendant Vergersky, and no other defendant, in her termination and merely states in a conclusory fashion that she "has reasons to believe that [she] was . . . terminated because of [her] job-related disabilities." (Compl., ¶ 2.) At the time of her termination, plaintiff had been on medical leave for her injured hand for over three weeks. (Id. at ¶¶ 45-47.) The termination letter sent by defendant Vergersky did not provide a reason for plaintiff's termination because plaintiff was categorized, she suggests wrongly, as a probationary employee. (Id. at ¶ 47.) Plaintiff does not state sufficient facts to plausibly suggest that defendant Vergersky terminated her because of her disability. See Graham, 2011 U.S. Dist. LEXIS 38398, at *14 (dismissing plaintiff's disability discrimination claim under the Equal Protection Clause because "plaintiff has not sufficiently alleged that she was treated differently than other teachers because of her disability."); Cutler v. City of New York, No. 09 Civ. 5335 (PKC), 2010 U.S. Dist. LEXIS 97435, at *12 (S.D.N.Y. Aug. 16, 2010) (dismissing public

employee's disability discrimination claim under the Equal Protection Clause because plaintiff "has not pled facts which plausibly demonstrate that the employment actions taken by the DOE were irrational").  Accordingly, the City defendants' motion to dismiss should be granted on plaintiff's Equal Protection claim of disability discrimination under 42 U.S.C. § 1983.

### 3.  First Amendment Retaliation Claim

Plaintiff alleges that her employment was terminated in retaliation for reporting that the union president coerced her into falsely confessing to Warden Bailey that she attempted to visit Lil' Wayne in the Two and Three Upper housing unit.  "To survive a motion to dismiss, 'a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Rivera v. Comm. Sch. Dist. Nine, 145 F. Supp. 2d 302, 308-09 (S.D.N.Y. 2001) (quoting Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)); see also Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008) ("Regardless of the factual context, we have required a plaintiff alleging retaliation to establish speech protected by the First Amendment."); Singh v. City of New York, 524 F.3d 361, 372 (2d Cir. 2008).  "The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  In Garcetti, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id. at 421.  "The objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is

'a practical one.'"  Weintraub v. Bd. of Educ. of the City of N.Y., 593 F.3d 196, 202 (2d Cir.

2010) (quoting Garcetti, 547 U.S. at 424).  In Weintraub, the Second Circuit "conclude[d] that,

under the First Amendment, speech can be 'pursuant to' a public employee's official job duties

even though it is not required by, or included in,  the employee's job description, or in response

to a request by the employer."  Weintraub, 593 F.3d at 203 (finding that a teacher's grievance

filed with his union regarding the school administration's failure to discipline a student in his

class was made pursuant to his official duties "because it was part-and-parcel of his concerns

about his ability to properly execute his duties") (citation and internal quotation marks omitted).

 For an employee's speech to be considered of public concern, the speech must relate to a

"matter of political, social, or other concern to the community."  Connick v. Myers, 461 U.S.

138, 146 (1983).  "Whether an employee's speech addresses a matter of public concern must be

determined by the content, form, and context of a given statement, as revealed by the whole

record."  Id. at 148.  "A speaker's motive is not dispositive in determining whether his or her

speech addresses a matter of public concern."  Sousa v. Roque, 578 F.3d 164, 173 (2d Cir. 2009).

"An employee who complains solely about his own dissatisfaction with the conditions of his own

employment is speaking 'upon matters only of personal interest.'"  Id. at 174 (quoting Connick,

461 U.S. at 147).  However, the Second Circuit clarified that "it does not follow that a person

motivated by a personal grievance cannot be speaking on a matter of public concern."  Id.

"Whether an employee's speech addresses a matter of public concern is a question of law for the

court to decide."  Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (quoting Lewis

v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999)).

 Even assuming that plaintiff was speaking as a citizen and not pursuant to her official

duties as a public employee for First Amendment purposes, plaintiff's speech did not address any

matter of public concern and therefore it is not protected by the First Amendment. Here, plaintiff's speech arose in the context of a personal disciplinary matter in the workplace. Plaintiff submitted her "whistle-blowing" report after her union's president allegedly coerced her to file a false confession regarding the Lil' Wayne incident. President Seabrook assured her that no disciplinary action would be taken against her if she submitted the confession to Warden Bailey. Although plaintiff does not provide a copy of her report, the report allegedly stated that her union president coerced her to submit a false report regarding her presence in the Two and Three Upper housing unit. Plaintiff characterizes the report as "divulging the criminal act Norman Seabrook perpetrated against [her]." (Compl., ¶ 38.) Plaintiff's appears to argue that her speech is protected because she reported that the union president forced her to commit a crime by falsifying her statement. Although plaintiff states that she submitted the report to the Commissioner of the Department of Correction, the Commissioner of the Department of Investigation and the Bronx County District Attorney's Office because she "could not keep this illegal act, that was forced upon [her,] silent any longer and had to speak out against it," plaintiff's intention is not dispositive of whether her speech addressed a matter of public concern. See Sousa, 578 F.3d at 173. Even when liberally construed, plaintiff's allegations do not plausibly suggest that she was speaking on a matter of public concern when she reported that defendant Seabrook coerced her to file a false statement regarding the Lil' Wayne incident.

Accordingly, the City defendants' motion to dismiss should be granted on plaintiff's First Amendment retaliation claim pursuant to 42 U.S.C § 1983.

### 4. Procedural Due Process Claim

Plaintiff claims that she was mischaracterized as a probationary employee and terminated from her employment as a correction officer on April 19, 2010 without due process. "In order to

prevail on a Section 1983 claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." Jackson v. Roslyn Bd. of Educ., 652 F. Supp. 2d 332, 338 (E.D.N.Y. 2009) (citing McMenemy v. City of Rochester, 241 F.3d 279, 285-86 (2d Cir. 2001)).  Property interests are not created by the Constitution, but rather "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).  To have a property interest in employment, an employee must have had "a legitimate claim of entitlement to it." Id.  "A public employee has a property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge." Ciambriello v. County of Nassau, 292 F.3d 307, 313 (2d Cir. 2002).  Such a guarantee may be created by a collective bargaining agreement or by statute. Id.

Defendants argue that plaintiff's procedural due process claim fails as a matter of law because she was a probationary correction officer at the time of her employment. (City Defs.' Mem., p. 33, n.6.)  Indeed, "[u]nder New York law, it is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason." Finley v. Giacobbe, 79 F.3d 1285, 1297 (2d Cir. 1996).  However, plaintiff alleges that she was misclassified as a probationary employee when she was terminated and the Court must accept this allegation as true for the purposes of the instant motion.[10]  (Compl., ¶ 47.)  Plaintiff does not

---

[10] Plaintiff alleges that the probationary employment period is twenty-four months and that she was employed by the Department of Correction from February 28, 2008 through April 19, 2010.  (Compl., ¶ 2.)

identify any provision in the collective bargaining agreement or any state statute providing that non-probationary correction officers are entitled to continued employment absent 'just cause' for discharge. However, liberally construing the complaint, plaintiff claims that she should not have been treated as a probationary correction officer when she was terminated, but rather as permanent civil service employee protected by Section 75 of the New York Civil Service Law. See Oba Hassan Wat Bey v. City of New York, No. 99 Civ. 3873 (LMM) (RLE) (consolidated cases) 2009 U.S. Dist. LEXIS 87793, at *46-47 (S.D.N.Y. Sept. 9, 2009) (correction officers within the New York City Department of Correction are civil service employees covered by Section 75 of the New York Civil Service Law). Section 75 of the New York Civil Service Law provides that a covered employee "shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section." N.Y. CIV. SERV. LAW § 75(1). Indeed, the Second Circuit has recognized that public employees in New York covered by Section 75 have a property interest in their employment that is protected by the Fourteenth Amendment. Ciambriello, 292 F.3d at 314.

Assuming for the purposes of the instant motion that plaintiff had a property interest in her employment, the question is whether plaintiff was deprived of that property interest without due process when she was terminated. See Narumanchi v. Bd. of Trs. of the Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988) ("If a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process. The second step of the analysis thus asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review."). Generally, when the government terminates the employment of a tenured public employee, "procedural due process is

33

satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." Locurto v. Safir, 264 F.3d 154, 171 (2d Cir. 2001) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46 (1985)). Plaintiff alleges that by letter dated April 19, 2010, defendant Vengersky terminated her employment and that she was not provided any pre-deprivation process, as she was allegedly misclassified as a probationary employee. (Compl., ¶¶ 2, 47.) After being notified of her termination, plaintiff wrote to defendant Vengersky requesting reinstatement or "an honest explanation for [her] sudden dismissal." (Id. at ¶ 47.) Plaintiff received no response. (Id.)

In McDonald v. Board of Education of the City of New York, No. 01 Civ. 1991 (NRB), 2001 U.S. Dist. LEXIS 10325, at *8-19 (S.D.N.Y. July 24, 2001), the Court addressed the due process rights of a tenured teacher who was allegedly misclassified as a probationary employee and terminated without a pre-deprivation hearing. "Considering the relative weight of plaintiff's interest, the prospective burden upon defendants of providing a predeprivation procedure that would have protected against the alleged deprivation of plaintiff's interest, and the availability of postdeprivation relief, [the Court found] that defendants did not violate plaintiff's due process rights." Id. at *19. Specifically, the Court reasoned that "New York would presumably be burdened with holding a tenure-status hearing prior to terminating any probationary worker in a theoretically tenurable position," and that "Article 78 of the New York Civil Practice Rules provides plaintiff a wholly adequate post-deprivation remedy." Id. at *16. The Court finds the facts in McDonald to be analogous to plaintiff's situation and therefore adopts the due process analysis set forth therein. As an allegedly misclassified probationary employee, plaintiff was not entitled to pre-deprivation notice and hearing. Moreover, as plaintiff had the *opportunity* to challenge the termination of her employment through an Article 78 proceeding, whether or not

34

she actually pursued such a challenge, the post-deprivation requirement of due process is satisfied. See Longo, 429 F. Supp. 2d at 559 ("[I]t matters not whether a plaintiff actually avails himself of the state court post-deprivation process.").

Accordingly, the City defendants' motion to dismiss should be granted on plaintiff's procedural due process claim pursuant to 42 U.S.C § 1983.

### 5. Municipal Liability Claim

Plaintiff's claim for municipal liability under 42 U.S.C. § 1983 cannot withstand the City defendants' instant motion to dismiss. A municipality can only be liable under 42 U.S.C. § 1983 if a plaintiff shows that an officially adopted municipal policy, custom, or practice caused the deprivation of his or her constitutional rights. Monell v. Dept. of Soc. Servs., 436 U.S. 658, 692 (1978). "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Id. at 691. As plaintiff does not allege that she suffered a constitutional violation caused by an officially adopted custom, policy, or practice of the City of New York, the City defendants' motion to dismiss should be granted on plaintiff's municipal liability claim under 42 U.S.C. § 1983.

## III.   Plaintiff's Claim Against Defendant Seabrook

Plaintiff alleges that defendant Seabrook, the president of the Correction Officers Benevolent Association, coerced her to provide a false report to her employer regarding the Lil' Wayne incident and later failed to take any action when she was terminated despite her pleas that she was wrongly classified as a probationary employee. The Court construes plaintiff's allegations against defendant Seabrook as a claim for breach the duty of fair representation owed to her by the union under the NLRA.[11]

---

[11] Plaintiff alleges that defendant Seabrook "completely disregarded the National Labor Relations Act, under 29

The duty of fair representation is inferred from Section 9(a) of the NLRA, which grants unions the exclusive right to bargain for all members of a designated unit. See Vaca v. Sipes, 386 U.S. 171, 177 (1967). However, the NLRA excludes "any state or political subdivision thereof" from the definition of "employer." 29 U.S.C. § 152(2). In short, the NLRA "leaves States free to regulate their labor relationships with their public employees." Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 181 (2007). As a result, courts have held that state and city employees cannot maintain a cause of action against their union for breach of the duty of fair representation under federal law.[12] See e.g., Straker, 333 F. Supp. 2d at 104 (employee of the New York City Transit Authority lacks a "cognizable federal claim" against the union for breach of the duty of fair representation); Muhlrad v. Mitchell, No. 96-CV-3568 (DLC), 1997 U.S. Dist. LEXIS 4683, at *11 (S.D.N.Y. April 14, 1997) (Plaintiffs, as employees of the New York City Health and Hospitals Corporation, "cannot maintain a cause of action against the Union based on the federal duty of fair representation."). As plaintiff was employed as a correction officer by the Department of Correction, an agency of the City of New York, she cannot bring a federal claim for breach of the duty of fair representation. Moreover, plaintiff's claim against defendant Seabrook for breach of the federal duty of fair representation fails because it is well-settled that "[u]nion officers and employees are not individually liable for acts performed as representatives

---

U.S.C. §§ 151." (Compl. ¶ 2.) As plaintiff only cites to the NLRA in her complaint, the Court does not construe plaintiff's complaint as asserting a claim under the Taylor Law. See N.Y. CIV. SERV. LAW § 209-a(2)(c) (providing public employees in New York a cause of action for breach of the duty of fair representation).

[12] A claim against a union for breach of the fair duty of representation may also be brought as a "hybrid" claim under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. In a "hybrid" claim, "the employee sues an employer under Section 301(a) for violating a collective bargaining agreement, and sues a union for breach of the duty of fair representation based on the failure of the union to pursue a grievance on behalf of the employee against the employer." Cunningham v. Local 30, Int'l Union of Operating Eng'rs, 234 F. Supp. 2d 383, 395 (S.D.N.Y. 2002). Because the NLRA's definitions of "employer" and "employee" apply to the LMRA, see 29 U.S.C. § 142(3), courts have held that "[t]he LMRA . . . does not vest federal district courts with subject matter jurisdiction over claims by public employees against their unions for breach of the duty of fair representation." Straker v. Metro. Transit Auth., 333 F. Supp. 2d 91, 104 (E.D.N.Y. 2004). Therefore, even if plaintiff brought a "hybrid" claim under Section 301 of the LMRA against her union and her employer, such a claim would fail because plaintiff is a public employee.

of the union." <u>Morris v. Local 819, International Bhd. of Teamsters</u>, 954 F. Supp. 573, 581 (E.D.N.Y. 1997) (dismissing claim for breach of the duty of fair representation against union trustee).

Accordingly, defendant Seabrook's motion for judgment on the pleadings should be granted on plaintiff's duty of fair representation claim under the NLRA.[13]

## CONCLUSION

For the reasons set forth above, it is respectfully recommended that the City defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure should be denied and that the City defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted in part and denied in part. All claims against the City defendants should be dismissed except for plaintiff's reasonable accommodation claims under the ADA. It is further recommended that defendant Seabrook's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure should be granted.

Should the Court adopt this Report and Recommendation, defendant shall file its answer to plaintiff's reasonable accommodation claims under the ADA within fourteen days. Fed. R. Civ. P. 12(a)(4)(A).

---

[13] Although defendant Seabrook's motion addresses potential claims under Title VII, the ADA, and Section 1983, the Court does not construe plaintiff's complaint as asserting such claims against defendant Seabrook, nor could plaintiff state a claim against defendant Seabrook under these statutes.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of Court.  Any request for an extension of time to file objections must be made within the fourteen day period.  Failure to file a timely objection to this Report generally waives any further judicial review.  Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

/Signed by Judge Lois Bloom/

LOIS BLOOM
United States Magistrate Judge

Dated:  September 14, 2011
          Brooklyn, New York

38